# September Term, 1945

No. 15,361.

AARON, doing business as SANITARY
SPECIALTIES COMPANY ET AL. *v.* WESEBAUM.
(162 P. [2d] 232)

Decided September 10, 1945.

Mr. Darwin D. Coit, for plaintiffs in error.

Messrs. Berman & Holland, for defendant in error.

*En Banc.*

Mr. Justice Alter delivered the opinion of the court.

Arthur E. Wesebaum obtained a judgment in the sum of one thousand dollars for damages sustained by him and resulting from a collision of his automobile with a car owned by David W. Aaron and driven by Harry Aaron, defendants. The Aarons bring the proceedings and judgment here by writ of error for review. Reference will be· made to the parties as plaintiff and defendants or by name.

In the complaint the defendants were charged with negligently operating their Dodge "pick-up" with resultant damages to plaintiff and his automobile. Defendant David W. Aaron filed his answer, alleging that the injuries of which plaintiff complained were proxi-

mately caused by his contributory negligence and also setting out a counterclaim in which he sought damages occasioned to his Dodge "pick-up." In a second counterclaim defendant Harry Aaron sought damages for personal injuries which he sustained in the collision.

The collision occurred at the intersection of Osage street and West Thirty-second avenue, in broad daylight. Harry Aaron was driving westerly on West Thirty-second avenue, and plaintiff was driving north on Osage street. The ordinances of the city of Denver governing rights-of-way and concerning reckless driving were set out in a stipulation between the parties, and there is no contention that defendants were not entitled to the right-of-way unless by reason of their violation of some provisions of the ordinances they had lost this advantage.

At the conclusion of plaintiff's evidence, defendants moved for a nonsuit. The motion was denied, and they thereupon proceeded with their evidence. At the conclusion of all of the evidence defendants interposed a motion for a directed verdict based upon the same grounds as was their motion for a nonsuit, i. e., that the plaintiff had failed to prove negligence on the part of the defendants and that the evidence conclusively established that the plaintiff himself was guilty of contributory negligence. This motion was overruled. If it should have been sustained, the judgment must be reversed.

The only witness for plaintiff, who had any knowledge of the facts and circumstances immediately preceding, and at the time of, the collision, was plaintiff himself, and we quote portions of his testimony.

On direct examination he testified: "Q. Where was your Chevrolet when you first saw the Dodge? A. Well, that is hard for me to tell, whether I was in—getting into the intersection or in the middle I just don't know. * * * Q. About how far into the intersection were you, do you know? A. Just getting towards the middle as—I

think. Q. Approaching the middle? A. Yes. Q. Did you look to your right or left before that time? A. I did. Q. Where was your Chevrolet when you looked to the right before that? A.. Well it was about 15 feet, I guess, from the intersection; usually look to the right and— Q. At that time what did you see if anything? A. Nothing. Q. Then what did you do? A. Then *I looked to the right, and proceeded, but of course then I looked straight ahead* and when I saw—looked again— Q. When you looked again? A. The second time. Q. *When you looked again the second time which way did you look?* A. To the right; *I saw this gentleman coming then.* Q. You saw the Dodge coming at that time? A. Yes. * * * Q. Can you tell the court and jury how fast it [Dodge] was going at that time? * * * A. Well I would judge about 30 miles an hour. Q. Can you describe whether the driver of the Dodge swerved to his right or left or did anything to avoid the accident? A. Not that I know of, I think I remember— Q. Did the Dodge run into you or did you run into the Dodge? A. No, the Dodge ran into me. Q. What part of your car did he run into? A. Right square in the middle. * * * Q. Did you say that you had gotten to about the middle of the intersection when he ran into you? A. I think that would be about right; I would not be certain, you know, but it seemed to me it would be in the middle there. * * * Q. Can you state what part of Thirty-second avenue the Dodge was in; that is, was it on the north side or the south side of Thirty-second avenue when you first saw it? A. No, I couldn't, he was— Q. You don't have any, or do you have— A. It was so fast, you know, that I just couldn't tell."

On cross-examination plaintiff, after having been confronted with an officer's testimony to the effect that at the time of the accident he stated that the first time he saw the Dodge car it was within five feet of him, testified as follows: "Q. But if you did say that to him [the officer] and it were as a fact five feet when you

first saw it, do you think you could judge the speed at a distance of five feet? A. No, not accurately, but he was farther away than that I am sure, he must have been 12 or 15 feet away, as I remember it. * * * Q. Do you think that the front end of your car had gotten to the middle of West Thirty-second by the time you first saw him? A. Well, I don't know for sure, I couldn't know, it came so quick there. Q. *Now when you first looked to the right, Mr. Wesebaum, you stated you were about 15 feet from the intersection; is that correct? A. Yes.* Q. And you mean by intersection 15 feet from where the curb line would extend on across? A. Yes. Q. How far could you see to the right when you looked at that time? A. O 40 or 50 feet. Q. When you looked you had time, or had you, to look—how long—did you just glance to the right or did you honestly look to the right? A. I looked to the right and then I looked to the left, and then I proceeded. Q. When you looked to the right from a distance of 15 feet from where the curb lines are you say you could only see 40 or 50 feet to the right? A. Well that is where I looked—pardon me, that is where I looked. Q. 40 or 50 feet to the right? A. Yes. Q. Is that as far as you could see to the right? A. Well I don't know, but that is—it would appear to me where I would look up there 40 or 50 feet. Q. And you did not see anything coming from your right? A. Not a thing, no sir. Q. *Was that as far as you could see? A. I don't know.* Q. I will ask you this, didn't you state at the taking of your deposition in answer to the following questions the following answers: '*Was your car in the intersection when you looked to the right?*' That is a question that was put to you in your deposition. A. *I was just getting in there. I don't think I was quite in the middle.* Q. Of the intersection? A. *Or pretty near into the middle there; I don't think quite.* Q. When you first looked? A. When I saw him. Q. *And that is the first time you looked to the right?* A. *I looked to the right and he wasn't there. I didn't see anybody, and*

*then when I looked the second time he was 15 feet away from me.'* Do you recall saying that? A. No I don't, and did you say that— Mr. Berman: I will admit he said that; he said that just now on the witness stand too. * * * Q. Did you look at your speedometer before you went into the intersection? A. I did as a rule. Q. Did you look at it just before you entered this intersection? A. Yes. Q. What did it register? A. 15 miles an hour. Q. Exactly 15? A. Yes. * * * Q. Do you think you only traveled two or three feet from the time you first saw him until the time you got hit? A. That is right, I am pretty sure. Q. Do you think he was five feet or 15 feet from you when you first saw him? A. Well, he must have been 15, I imagine. Q. If he traveled 15 feet while you traveled two or three—if it were two feet you would be traveling—he would be traveling over seven times as fast as you were going, is that correct? * * * A. I don't know, I don't know.. * * * Q. When the front end of your car was 15 feet from the curb line entering the intersection, did you look to the right as far as you could see down there? A. I looked to the right, where I usually look, ordinarily, about 40 or 50 feet, I imagine. Q. *You didn't try to take anything in your view beyond 40 or 50 feet?* A. *No.* Q. Do you know how far you can actually see from the right when the front end of your car is 15 feet of entering the intersection? A. Not exactly; you asked me where I looked and I said I looked 40 or 50 feet there, and there was nobody there, then I proceeded."

On redirect examination plaintiff testified: "Q. One question I don't remember whether I have asked you; was there a house on the corner to your right as you entered that intersection? A. Yes there is. Q. There is a house there on the corner? A. Yes. Q. And until you pass that house the house obstructed your view to the right? A. It would, yes."

On recross-examination the plaintiff testified: "Q.

*Well then from the point where you looked the house did not obstruct your view did it? A. O no.*"

Charles Stevenson, plaintiff's witness, testified that he was a patrolman and was called to the scene of the accident shortly after it occurred, and Harry Aaron admitted that some skid marks about two feet southerly of the center line of West Thirty-second avenue were skid marks made by the car he was driving. These skid marks were about two or three feet long.

John F. Spitz, a relative of plaintiff, testified that he arrived at the scene of the collision shortly after its occurrence and that he saw skid marks on the pavement "south of the middle of the street on West Thirty-second avenue and Osage," and that these skid marks were about two feet beyond the center of West Thirty-second avenue.

Dr. O. R. Sunderland, a witness, testified that plaintiff was the victim of Berger's disease which had resulted in the amputation of both his legs and some of his fingers. He testified further to the physical condition of plaintiff after the accident and the injuries he received therein.

Arthur A. Michael, the file clerk in the Motor Vehicle Department of the state of Colorado, testified as to the department's approval of the artificial device used by plaintiff in the operation of his automobile, and another witness testified to the cost of repairing plaintiff's automobile.

Defendants called a physician who testified to the injuries received by Harry Aaron, the driver of defendants' automobile, and another witness who testified concerning the damage to defendants' automobile. This evidence becomes unimportant because the counterclaims of the defendants for personal injuries, as well as damages to the car, were not the basis of any judgment herein, and no error is assigned with reference thereto.

Harry Aaron, one of the defendants, testified, upon cross-examination under the statute, as well as on di-

rect examination. His testimony is unimportant in the consideration of the motion for a directed verdict because it merely interjected a conflict in the evidence.

Roy Strine, a disinterested witness, testified that he was a passenger in a car about two-thirds of a block behind defendants' car and witnessed the accident; that the car in which the witness was traveling was going about eighteen or nineteen miles an hour and it was overtaking defendants' car at the time it entered the intersection of Osage street and West Thirty-second avenue, and that defendants' car was driven on the right or northerly side of West Thirty-second avenue. The witness further testified that plaintiff's car, at the time it entered the intersection of Osage street and West Thirty-second avenue, was traveling faster than was defendants' car, and he estimated the speed of plaintiff's car at twenty-five to twenty-eight miles per hour. On cross-examination the witness testified that the skid marks of defendants' car were plainly visible for ten to twelve feet before the point of impact.

Charles Stevenson, recalled by plaintiff in rebuttal, testified that he asked Mr. Aaron if the skid marks on the south side of West Thirty-second avenue were made by his car, and Mr. Aaron answered, yes. He further testified that shortly after the accident he inquired of plaintiff as to the point at which he saw defendants' car for the first time prior to the accident, and plaintiff stated to him that defendants' car was within five feet when first seen by him.

Wayne C. Todd, employed by the Mile High Photo Company as a commercial photographer, testified that he had taken some photographs on the ground where the collision occurred for the purpose of clearly portraying the scene of the accident, particularly with reference to the distance a person could see easterly on West Thirty-second avenue from a point fifteen feet from the southerly line of that avenue at its intersection with Osage street; that he had caused cars to be

placed at various points on West Thirty-second avenue; had taken photographs which he exhibited and which were admitted in evidence. These exhibits and the testimony relative thereto clearly indicated that had plaintiff exercised due caution, he could have seen defendants' car approaching the intersection of West Thirty-second avenue and Osage street one hundred and fifty feet before it reached that point.

The foregoing is a summary of the testimony offered by plaintiff and defendants with reference to conditions at the scene of the accident immediately prior and subsequent thereto.

The ordinances of the city of Denver provide, inter alia: "Every driver of a vehicle approaching the intersection of a street shall yield the right-of-way at such intersection to the driver of any vehicle approaching from the right, and the driver of the vehicle on the left shall decrease the speed of the vehicle operated by him and have said vehicle under control before crossing such intersection, and it shall be his duty to yield the right-of-way to the vehicle on the right; * * * §65 (a) Denver Municipal Traffic Ordinance.

Another section of the ordinance provides that any driver operating his vehicle without lights for a time when the same were required or who drives to the left of the center of the street or who is guilty of reckless driving shall have no right-of-way. §65 (d) id.

Under the ordinances of the city of Denver, it is unquestioned that the defendants were entitled to the right-of-way at the intersection involved unless they had lost it by reason of their violation of some of the provisions of the ordinances governing and regulating automobile traffic in Denver. Assuming that they had violated some of such provisions whereby they lost their right-of-way, this would not in anywise relieve plaintiff of the duty of obedience to the ordinances which governed him on approaching the intersection. The ordinance quoted above sets forth the duty of plaintiff

under the circumstances in this case. He, by his own admission, violated the ordinance. He states that there was nothing to obstruct his vision easterly on West Thirty-second avenue. The exhibits clearly and indubitably establish that had plaintiff looked easterly on West Thirty-second avenue, he could have seen a car approaching at a distance of one hundred twenty feet or more, and the testimony to this effect is undisputed. Notwithstanding this, plaintiff testified several times that in looking easterly on West Thirty-second avenue he confined his vision to those things that were within forty or fifty feet of the intersection. Plaintiff had the burden of establishing the negligence of the defendants and also the burden of satisfactorily explaining his own negligence in taking the right-of-way, admittedly a violation of the city ordinance. It will be presumed that plaintiff saw what he could and should have seen if he had obeyed the provisions of the ordinance and looked to the right, and, as we said in *Kracaw v. Micheletti,* 85 Colo. 384, 386, 276 Pac. 333: "Having the burden of proof and admittedly guilty of negligence prima facie, before the plaintiff had a right to go to the jury, it was necessary for her to explain her act of negligence in failing to yield the right-of-way. This she attempts by saying, 'I thought I had time to cross before the car would get to the intersection.' This explanation, however, is not sufficient because it was not a conclusion which could have been arrived at by a reasonably prudent person in her position. She testified that 15 feet back of the intersection she saw defendant's car 200 feet from the intersection, that she looked a second time and saw defendant's car a hundred feet from said intersection and that she had traveled a foot and a half in the interval, and yet she could not tell whether defendant's car was traveling slow or fast. *An automobile driver does not perform his duty if he merely looks to the right.* The look must be accompanied by reasonable thought and judgment, otherwise there would be no

reason for the duty. One could, in effect, drive the streets blindfolded and still be absolved from his own negligence. No reasonably prudent person in plaintiff's position would have failed to recognize the fact that defendant's car was approaching at an excessive and negligent rate of speed. Plaintiff cannot be heard to say that she failed to recognize the speed of defendant's automobile. *She has wholly failed to explain her own negligent act* and to maintain the burden of proof. * * * [citing cases]" (Italics ours).

It was clearly the duty of the plaintiff under the ordinances of the city of Denver to look to the right and to yield the right-of-way to any car approaching the intersection from that direction, and under the evidence herein, had he performed this duty, he would have seen defendant's auto in ample time to have stopped his car and avoided the collision; but he neglected to do so, and, in view of such neglect, he was guilty of contributory negligence as a matter of law.

Our own decisions clearly support this conclusion. Among these may be mentioned: *Colorado Springs Co. v. Cohun,* 66 Colo. 149, 150, 180 Pac. 307; *Golden Eagle Co. v. Mockbee,* 68 Colo. 312, 189 Pac. 850; *Rosenbaum v. Riggs,* 75 Colo. 408, 225 Pac. 832; *St. Mary's Academy v. Newhagen,* 77 Colo. 471, 238 Pac. 21; *Kracaw v. Micheletti,* 85 Colo. 384, 276 Pac. 333.

Under the evidence and the law applicable thereto, the plaintiff herein was guilty of contributory negligence. Negligence on the part of the defendants, if such existed, did not relieve him of the plain duty of obeying the provisions of the ordinances. The motion of defendants for a directed verdict should have been granted, and the failure of the trial court so to do constituted error.

The judgment is reversed and the cause remanded with instructions to dismiss the action.

MR. JUSTICE KNOUS dissents.